**Joann L. FIALA, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 1–01–CV–90052.**

United States District Court, S.D. Iowa, Western Division.

Dec. 12, 2002.

Patrick B. Cavanaugh, Omaha, NE, for Plaintiff.

Christopher D. Hagen, Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Joann L. Fiala, filed a Complaint in this Court on October 19, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and remanded for further proceedings.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on September 14, 1999, claiming to be disabled since August 31, 1997. Tr. at 80–82. Plaintiff is insured for Title II benefits until the end of December, 2002. Tr. at 83. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Robert H. Burgess (ALJ) on January 10, 2001. Tr. at 24–51. The ALJ issued a Notice Of Decision—Unfavorable on April 6, 2001. Tr. at 11–20. After the decision was affirmed by the Appeals Council on August 22, 2001, (Tr. at 5–7), Plaintiff filed a Complaint in this Court on October 19, 2001.

## MEDICAL RECORDS

On July 25, 1997, Plaintiff saw Ronald K. Miller, M.D. because of pain in her right hip. X-rays showed minor arthritic changes in the lumbar spine and moderately severe medial wall arthritis in the right hip. Tr. at 191. Plaintiff saw Clifford K. Boese, M.D. on August 26, 1997. Plaintiff said that the pain in her hip was getting gradually worse. Dr. Boese's diagnosis was degenerative arthritis right hip. Plaintiff's work status was "full duty without restrictions." Tr. at 190. Plaintiff saw Dr. Boese again on January 14, 1998. She told the doctor that she was having worsening pain and that it was very difficult for her to get around. X-rays showed severe degenerative arthritis of the right hip with bone on bone changes medially and extensive osteophyte formation. Dr. Boese recommended that Plaintiff be scheduled for a hip replacement. Tr. at 189. On February 16, 1998, Plaintiff was admitted to Jennie Edmundson Hospital in Council Bluffs, Iowa. That same day she underwent a cementless total hip replace-

ment on the right. After the surgery Plaintiff was seen in the department of occupational therapy for activities of daily living. Tr. at 148. By February 19, Plaintiff was doing well enough to be discharged from the hospital with instructions for her to see her doctor in 10 to 14 days. Tr. at 149. Dr. Boese was the surgeon who performed the operation. Tr. at 164. Plaintiff saw Dr. Boese again on March 11, 1998 at which time she was getting along well with the use of a walker. The doctor recommended that Plaintiff continue to use the walker for another three weeks with progressive weight bearing as tolerated until she could walk with a cane. Tr. at 188. On April 8, 1998, Plaintiff was using the cane but was able to walk without it. The doctor commented that Plaintiff's gait was "actually very good." He told Plaintiff to wean herself off the cane. Tr. at 187. On May 1, 1998, Plaintiff told Dr. Boese that she was having pain at night. After his examination, the doctor opined that Plaintiff may have been developing trochanteric bursitis. He instructed her on using a pillow between her legs and said that if the pain did not clear he would perform an aspiration to rule out infection, although he doubted that it would be necessary. Tr. at 186. On June 19, 1998, the pain was gradually improving and Dr. Boese noted a very excellent gait. Under the heading work status, the doctor wrote: "Full duty without restrictions." On August 21, 1998, Plaintiff was having no pain and the doctor said she was doing quite well. He instructed her on some exercises and said she should return in six months.

Tr. at 184. On March 26, 1999, after an examination, Dr. Boese wrote: "She is doing very well with the hip. There are no restrictions but if she finds a particular activity that causes pain she should avoid it." Tr. at 183.

Plaintiff was admitted to the hospital again on November 24, 1998, at which time she underwent a total abdominal hysterectomy. She was discharged on November 27, 1998. Tr. at 167. On December 11, 1998, Plaintiff saw William L. Kuyper, M.D. for a post operative check. Plaintiff was doing quite well and was having no real problems. Tr. at 197. On December 21, 1998, Plaintiff was seen by Bryan Imamura, M.D. because the biopsy had showed "a well-differentiated adenocarcinoma of the endometrium." Plaintiff was referred to Dr. Imamura for consideration of adjuvant treatment. Tr. at 207. The treatment Plaintiff was asked to consider involved the implantation of a radiation instrument. The doctor explained Plaintiff's options and told her that chances of reoccurrence was between 5 and 10%, "probably closer to 5%." Before his physical examination, the doctor made a "review of systems," under which heading, it was noted that Plaintiff said that she had "occasional diarrhea." Tr. at 208. Plaintiff was seen again on January 7, 1999 at Dr. Kuyper's office at which time she decided not to undergo postoperative radiation, a decision which Dr. Kuyper wrote that he supported. Tr. at 197.

When Plaintiff saw Dr. Imamura, her medications were listed at Glucophage[1], Amaril[2], Synthroid[3] and Zestril[4]. Tr. at

1. GLUCOPHAGE® (metformin hydrochloride tablets) is an oral antihyperglycemic drug used in the management of type 2 diabetes. Physician's Desk Reference (PDR).

2. The Court was unable to find a PDR definition of this medication but Dr. Reher's office notes indicate that it is prescribed for blood sugar control. Tr. at 239.

3. SYNTHROID is indicated as replacement or supplemental therapy in patients with hypothyroidism of any etiology including partial or total absence of the thyroid gland. PDR.

4. ZESTRIL is indicated for the treatment of hypertension. PDR.

207. On March 17, 1999, Plaintiff's Hemoglobin A1C[5] was noted to be 8.4. Tr. at 206. On November 10, the Hemoglobin A1C was 7.9. Glucose was noted to be 231 on August 10, 1998. Tr. at 218. On November 10, 1998, glucose serum was 276 and the A1C was 7.9. Tr. at 216. On November 20, 1998, Plaintiff's blood glucose was 192. Tr. at 211. There are numerous other blood sugar readings in the record, however suffice it to say here that they are all above the normal levels noted in foot note 4, below. On May 1, 1998, Plaintiff saw Evelyn Reher, M.D. The doctor noted that Plaintiff's blood sugar readings, which were in excess of 200, were "way too high." In spite of an increase in the dosage of Amaryl, the sugar levels had not dropped when Plaintiff was seen again on June 16, 1998. Tr. at 239. On November 13, 1998, both Plaintiff's weight and blood sugars were up and Plaintiff expressed her frustration to Dr. Reher. Plaintiff was interested in diabetic classes, so the doctor made the arrangements. Tr. at 238. On June 4, 1999, Dr. Reher noted that Plaintiff had attended the classes but the blood sugars were still elevated. The doctor asked Plaintiff to watch her diet very closely and to exercise. When seen on June 18, 1999, Plaintiff told the doctor she was having a lot of diarrhea. On July 22, 1999, the doctor noted that Plaintiff was tolerating her medication well, although the blood sugars were 246 fasting, and 329 two hours later. On August 12, 1999, the doctor prescribed insulin. Tr. at 236. On September 3, 1999, because the blood sugars were still above 200, the dosage of insulin was increased. Tr. at 235. On June 22, 2000, Plaintiff's A1C was up to 8.7 and her weight was up by approximately 10 pounds. Plaintiff said that due to a death in the family and taking care of a number of people, she was not watching her diet or exercising. Plaintiff complained of some sharp pains in her lower extremities which the doctor said could be due to diabetic neuropathy. Tr. at 270. On June 29, 2000, Plaintiff's blood sugars were "much improved from prior." On September 7, 2000, Plaintiff's A1C was down to 7.5 "which is better." Tr. at 269.

Plaintiff was seen for a disability physical on December 14, 1999, by Stuart R. Schlanger, M.D. Plaintiff said she was applying for disability because of her right hip and back. The doctor wrote:

> She said the surgery "helped a lot." Specifically, prior to surgery she was walking a mile but now she said she can walk a mile with less effort. Prior to surgery, she was only able to sit for 5 minutes; now she can sit for an hour. Again, prior to surgery she could stand for 15 minutes and now she says she can stand for up to an hour. She has required no medicines except occasional ibuprofen for pain postoperatively. She had no specific postop problems. She said she last worked in 1997. She did factory and line work and had to lift 20 pounds repeatedly. She said she left

---

**5.** A test that measures a person's average blood glucose level over the past 2 to 3 months, the test shows the amount of glucose that sticks to the red blood cell, which is proportional to the amount of glucose in the blood. *See* American Diabetes Association's web site at *http://www.diabetes.org/main/info/dictionary.jsp* According to Thomas A. Lincoln, MD, (*ht tp://www.diabetes.org/main/community/forecast/page66.jsp*), a healthy person without diabetes will have an A1C value that ranges between 4 percent and 6 percent. If diabetes is under good control, the A1C value should be below 8 percent. If the patient is doing especially well, the A1C value will be less than 7 percent and may even approach the normal level. The closer it is to this normal level, the better the diabetes is under control. A good blood sugar range for most people with diabetes is from about 70 to 120 (mg/dl). According to Dr. Lincoln, an A1C value of 10 indicates average blood sugars of 240, and an A1C of 11 indicates blood sugars of 270.

due to relocation to Council Bluffs. Her primary life work has been in sales; at present, she keeps busy with gardening and housework.

Tr. at 241. After a physical examination, Dr. Schlanger opined that Plaintiff is able to lift and carry up to 20 pounds frequently throughout the day. He said Plaintiff is able to stand, move about and walk frequently and sit continuously. Stooping, climbing, kneeling and crawling could be done occasionally. There were no limits placed on her ability to handle objects, see, hear, speak or travel. Finally, the doctor said that Plaintiff's work environment could include dust, furnes, and temperature if approved safety gear were used. Tr. at 242.

Plaintiff was seen by a physical therapist on July 28, 2000, on referral from Ronald K. Miller, M.D., because of a diagnosis of osteoarthritis of bilateral knees. Plaintiff said that she had not been using any assistive device with which to walk, but she was wearing neoprene knee braces. Plaintiff was instructed in several stretching and other exercises to gradually increase her strength. Tr. at 271–72.

A barely legible hand written note was submitted by Plaintiff's counsel. The note was written by Bobby Tolosa, M.D. The Court is simply unable to decipher most of the note, but it appears to state that Plaintiff should not lift more than 10 pounds or do prolonged standing. Tr. at 275.

### ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on January 10, 2001. Tr. at 24–51. Plaintiff testified that of the diabetes is the more limiting of her impairments because the medication she takes cause diarrhea, headaches, and nausea. She said that in spite of the successful hip surgery, she has pain if she sits, stands or walks too long. Tr. at 27. Plaintiff also pointed out that she's had

cortisone shots in her knees because of arthritis. Tr. at 28. She said that on days when she's more active with chores such as laundry, she will wear elastic braces on her knees. She also said that going up and down stairs is hard on her knees. Tr. at 42.

Plaintiff's was asked if any of her doctors had told her that she is unable to work and she said they had not. Tr. at 29.

Plaintiff said that she stopped working in August of 1997 because she had the surgery on her hip and because she moved from one city to another. Tr. at 30.

Plaintiff testified that she could sit or stand a half hour to an hour if she can change positions. She said that when she is sitting, she needs to elevate her right foot to keep the hip from hurting. Tr. at 31. Plaintiff said that she can walk one or two blocks before her hip begins to hurt. She said that she can lift about eight pounds. Tr. at 32. Plaintiff said that after standing or walking for a half hour to an hour, she needs to sit or lay down to relieve the pain. After sitting, she needs to stand up and move around. She testified that she needs to lie down a couple of hours during the day. Tr. at 39.

Plaintiff testified that she had worked in a hardware store for about 12 years until 1992. She said that job required a lot of carrying and that she had to climb a lot of stairs. Because of those activities, her hip was bothering her. At the same time, a factory moved into town and she got a better paying, less physically demanding, job assembling electric components. That job, however, caused problems in her wrists. Tr. at 33. Earlier, she testified that while working at the factory, she wore braces on her wrists but that she discontinued doing so after she quit working. Tr. at 30.

Plaintiff said that she started having diarrhea after she started taking medication for diabetes which was diagnosed after she had the hip surgery. Tr. at 37. She said that she needs to use the restroom about every half hour, and that each visit usually takes four or five minutes. Tr. at 40. Plaintiff said that her doctor told her that diarrhea was just one of the things that went with diabetes, although it does not affect everyone in that way. Tr. at 41.

Plaintiff said that her ability to work throughout an eight hour day, assuming an ability to sit and stand at will, would depend on her ability to use the bathroom when she needs to. She also said that she would need to be able to rest for 10 or 15 minutes each hour. Tr. at 44.

At the conclusion of Plaintiff's testimony, the ALJ called Sandra Trudeau to testify as a vocational expert. Tr. at 45. The vocational expert testified that Plaintiff had two relevant past jobs. Plaintiff worked as a sales person, general hardware, a light semi-skilled job. She also worked as an assembler of electrical accessories, a light unskilled job. Plaintiff's age of 60, put her in the regulatory category of a person of advanced age. Tr. at 46. The vocational expert testified that Plaintiff's skills are highly marketable because "they're found in significant numbers in the national economy and they're very common type of jobs. They're sales type jobs." Tr. at 47. Next, the ALJ asked:

... And so in her particular case, according to the doctors who made a residual functional capacity assessment, doctors from the DDS, they determined that she could perform light work.

.    .    .    .    .

And as far as postural limitations she could, on page e of exhibit 8F, that she could occasionally climb, balance, stoop, kneel, crouch, crawl. I think that, that's the only limitation. So would she be able to return to her past relevant work based on that?

In response, the vocational expert said that Plaintiff would be able to do both of her past jobs. In response to a question from the ALJ, the vocational expert testified that Plaintiff's testimony regarding diarrhea and nausea, the need to sit with her foot elevated, and the ability to lift only 8 pounds along with the need to take rest breaks throughout the day, would all eliminate the possibility of competitive work. Tr. at 48.

## ADMINISTRATIVE DECISION

In his decision dated September 18, 2000, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time pertinent to the decision. He found that Plaintiff has severe impairments but none that meet or equal any listed in Appendix 1, Subpart P, Regulations No. 4. Tr. at 49. The ALJ found that Plaintiff is able to do her past relevant work and, in that regard, that she has a residual functional capacity consistent with his first hypothetical. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 20.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's deci-

sion and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

In this case, the ALJ relied on residual functional capacity forms completed by doctors at the Disability Determination Services who had never examined Plaintiff to find that she is able to perform light work. It is well settled law in this Circuit, that ordinarily, such opinion does not constitute substantial evidence on the record as a whole. *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) quoting *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998) ("the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.") The Court in *Singh* went on: "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits."

In December of 1999, Plaintiff told doctor Schlanger that she was still able to function quite well in respect to the residuals from her hip replacement. Several months later, however, in June of 1999, Plaintiff complained to her doctor that she was having pain in her leg and Dr. Reher opined that the sharp pains Plaintiff was experiencing were due to diabetic neuropathy. Dr. Reher did not comment on Plaintiff's ability to function, and her silence can not be accepted as substantial evidence of a residual functional capacity. *Hutsell v. Massanari,* 259 F.3d 707, 712 (8th Cir.2001) (A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter... particularly when that doctor did not discharge the claimant from treatment.) Because the diagnosis of neuropathy was made approximately six months later, it is entirely possible that Plaintiff's condition had deteriorated due to her blood sugar level remaining out of control. Diabetic neuropathy is a problem that occurs in as many as 80% of all diabetics and there are serious and frequent complications in Type II diabetics. *See* Attorneys Medical Advisor, L.R. Russ, et al., published by Clark, Boardman, Callaghan, § 113:32 b. On remand, Dr. Reher should be asked to testify, or at least to submit a report to address the question of Plaintiff's residual functional capacity. If Plaintiff is now seeing other doctors in addition to Dr. Reher, they should also be consulted. If treating sources do not adequately address the relevant questions, then Plaintiff should be referred to an appropriate medical specialist who is provided with copies of all medical records for review and who will be asked to render an expert opinion regarding Plaintiff's ability to function.

Likewise, the issue of Plaintiff's diarrhea should be developed with medical evidence. "The well known tendency of diabetics to develop diarrhea may result from the abnormal motility or from bacterial overgrowth in the intestine." Attorneys Medical Advisor, § 113:32 c. *See also,* § 73:19 b. ("Diabetes is a major cause of secondary

**1174**

neurologic problems. In addition to a polyneuropathy in the legs and feet, characterized by altered sensation and, frequently, pain, diabetes affects the autonomic nerves, resulting in abnormalities of bladder and bowel function, sexual function, sweating, and the like.") In *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983), the Court wrote: "It is the administrative law judge's duty to develop the record fully and fairly even if, as in this case, the claimant is represented by counsel."

The Court has read the record of this case in detail. The ALJ's decision is not supported by substantial evidence on the record as a whole. The Court has considered the evidence which supports the ALJ's decision as well as evidence which detracts therefrom. In spite of the fact that the ALJ's decision, which stands as the final decision of the Commissioner, is not supported by substantial evidence on the record as a whole, the Court is not of the opinion that the record as now developed supports an award of benefits. The case, therefore, is reversed and remanded for further administrative proceedings consistent with this Order.

### CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole.

Defendant's motion to affirm the Commissioner's decision is denied. Plaintiff's motion to reverse is granted. The case is reversed and remanded for further proceedings consistent with this Order. The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78

F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.